PAMELA D. CORCORAN *v.* DEPARTMENT OF
SOCIAL SERVICES
(SC 16955)

Sullivan, C. J., and Borden, Katz, Vertefeuille and Zarella, Js.

Argued January 9—officially released November 9, 2004

*Charles D. Ray*, with whom were *K. Bradoc Gallant* and, on the brief, *Ingrid L. Moll*, for the appellant (plaintiff).

*Hugh Barber*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Richard J. Lynch*, assistant attorney general, for the appellee (defendant).

*Opinion*

VERTEFEUILLE, J. The plaintiff, Pamela D. Corcoran, appeals from the trial court's judgment dismissing her appeal from the decision of the defendant, the department of social services (department), to discon-

tinue her medicaid benefits because her assets, in the form of a testamentary trust, exceeded the prescribed limits. The plaintiff claims that the trial court, by incorrectly concluding that the department's administrative hearing officer properly excluded an earlier order of the Probate Court construing the trust, improperly dismissed her administrative appeal. Specifically, the plaintiff claims that, pursuant to the doctrine of collateral estoppel, the administrative hearing officer should have admitted and given preclusive effect to the Probate Court's previous construction of the trust. In the alternative, the plaintiff claims that the trial court: (1) improperly affirmed the hearing officer's conclusion that the assets of the testamentary trust were available to the plaintiff; and (2) improperly affirmed the hearing officer's decision to exclude extrinsic evidence of the testator's intent. We conclude that the trial court properly concluded that: (1) the hearing officer was not collaterally estopped from construing the trust; (2) the hearing officer correctly determined that the trust was an asset available to the plaintiff; and (3) the hearing officer did not abuse her discretion in excluding extrinsic evidence offered to prove the testator's intent. Accordingly, we affirm the judgment of the trial court.

This appeal involves two separate proceedings, a Probate Court hearing and an administrative hearing before a department hearing officer, related to the construction of a trust created by Lyman M. Corcoran (testator), in his will of November 3, 1987, for the benefit of the plaintiff, his daughter. The testator's will provided that, upon his death, his residuary estate should be divided equally among his three daughters, Robin C. Turek, Imogen J.C. Kellogg and the plaintiff. Pursuant to the will, Turek and Kellogg each would receive their one-third share directly, while the remaining one-third was

to be held in trust for the plaintiff, who is mentally disabled.[1]

The testamentary language creating the trust provided that "[i]f my daughter [the plaintiff] is then living, the trust established for her shall be retained by my trustees to hold, manage, invest and reinvest said share as a Trust Fund, paying to or expending for the benefit of [the plaintiff] so much of the net income and principal of said Trust as the Trustees, in their sole discretion, shall deem proper for her health, support in reasonable comfort, best interests and welfare . . . ." Additionally, the will provided that "[a]mong the circumstances and factors to be considered by the trustee in determining whether to make discretionary distributions of net income or principal to a beneficiary are the other income and assets known to the trustee to be available to that beneficiary and the advisability of supplementing such income or assets."

The testator died on May 29, 1989. Thereafter, the Probate Court appointed the plaintiff's sisters as trustees of the trust, which they funded in 1992. From the time the trust was funded until December 31, 2000, the trust receipts totaled $854,307.95. During the same period of time, the plaintiff received $150 from the trust.[2]

Following the testator's death,[3] the department granted the plaintiff's application for financial and medi-

[1] The hearing officer found that the "hearing record does not contain substantiation of the type of impairment that caused the Social Security Administration to find the [plaintiff] disabled" and that the plaintiff "did not have a disabling impairment at the time her father signed his will . . . ."

[2] The trustees also distributed $109,159.80 for fees and taxes, $10,968.35 in legal fees, and $711.34 for miscellaneous expenses.

[3] The department granted the plaintiff's application for medicaid benefits on November 3, 1989, but made the benefits effective retroactively, commencing on June 1, 1988. The record reveals that the plaintiff was a recipient of medical assistance to the aged, blind and disabled and a qualified medicare beneficiary.

cal assistance under the state administered medicaid program (medicaid benefits).[4] As of February, 2001, the plaintiff's monthly income included $19 from Supplementary Social Security Income (SSI), $531 from Social Security and $175.46 from employment. Upon learning that the plaintiff was the beneficiary of the trust created by the testator, the department notified the plaintiff, by a letter dated February 26, 2001, that it was discontinuing her medicaid benefits because her assets, including the trust, exceeded the relevant asset limits.[5] At the plaintiff's request, an administrative hearing was scheduled for April 26, 2001, to review the department's decision to terminate her medicaid benefits.

Shortly before the department notified the plaintiff of its intention to discontinue her medicaid benefits,[6] the trustees petitioned the Probate Court, pursuant to General Statutes § 45a-98 (a) (4),[7] to construe the terms of the trust "as they pertain to any rights the State . . . may have to claim reimbursement from the Trust for benefits heretofore provided . . . and/or for any such

---

[4] " 'Medicaid is a federal program that provides health care funding for needy persons through cost-sharing with states electing to participate in the program.' " *Szewczyk* v. *Dept. of Social Services*, 77 Conn. App. 38, 40, 822 A.2d 957 (2003), quoting *Greenery Rehabilitation Group, Inc.* v. *Hammon*, 150 F.3d 226, 227 (2d Cir. 1998).

[5] The asset limits are $1600 for the aged, blind and disabled benefits program, and $4000 for the qualified medicare beneficiary program. Dept. of Social Services, Uniform Policy Manual § 4005.10.

[6] The record is unclear as to the date the trustees filed their petition in the Probate Court. The certification page, however, indicates that the petition was mailed to the other parties on February 13, 2001.

[7] General Statutes § 45a-98 (a) provides in relevant part: "Courts of probate in their respective districts shall have the power to . . . (4) except as provided in section 45a-98a, construe the meaning and effect of any will or trust agreement if a construction is required in connection with the administration or distribution of a trust or estate otherwise subject to the jurisdiction of the Probate Court, or, with respect to an inter vivos trust, if that trust is or could be subject to jurisdiction of the court for an accounting pursuant to section 45a-175, provided such an accounting need not be required . . . ."

benefits provided by the State to the [plaintiff] in the future."[8] Specifically, the trustees asked the Probate Court to issue "a ruling classifying said Trust as a 'special needs' trust, from which it is neither appropriate nor required to reimburse said State for benefits received by [the plaintiff] . . . ." The Probate Court scheduled a hearing for May 4, 2001.

Prior to the Probate Court's hearing, the department conducted the scheduled administrative hearing to determine whether the department properly discontinued the plaintiff's medicaid benefits. Before the hearing officer, counsel for the department argued that the department properly had characterized the trust as a general support trust, the assets of which were available to the plaintiff, and properly had discontinued the plaintiff's medicaid benefits because of excess assets. The plaintiff's counsel contended that the trust was more properly characterized as a supplemental needs trust from which the plaintiff could not compel distributions, and counsel asked the hearing officer to delay ruling on the issue until the construction action pending before the Probate Court was resolved. Because the plaintiff was not present at the hearing, however, the hearing officer requested that the plaintiff's counsel either produce the plaintiff or provide medical evidence explaining her absence. Thereafter, the hearing officer suspended the proceedings until such medical evidence was provided or the plaintiff appeared before her.

The department subsequently notified the Probate Court of the pending administrative proceedings and urged the court not to proceed with the hearing scheduled for May 4, 2001. The department premised this request on the fact that it already had litigated this

[8] The trustees notified the plaintiff and the department of their petition, both of whom appeared and fully participated in the Probate Court proceedings.

"exact issue," namely, the proper construction of the trust, before the hearing officer and should not be forced to defend its actions in two separate forums.

Over the department's objection, the Probate Court conducted the scheduled hearing.[9] In an order dated June 12, 2001, the court determined that the testator intended the "trust at issue . . . to be . . . a 'special needs, discretionary trust' not otherwise available to the state . . . ." The Probate Court also stated: "Although [this] court lacks the power to order any department of the state . . . to reinstate benefits to a party before this court, it respectfully requests that the state do so in this case . . . ."[10]

Before the Probate Court issued its order, the administrative hearing reconvened with the plaintiff in attendance on May 31, 2001. At the conclusion of the hearing, the hearing officer, at the department's request, agreed to keep the hearing record open until June 8, 2001, to allow the department time to submit a rebuttal and comments. On July 12, 2001, the hearing officer issued a ruling on the hearing record, indicating that she had closed the record on June 8, 2001, four days prior to the issuance of the Probate Court's decision on June 12, 2001. Thereafter, on July 17, 2001, the hearing officer issued a decision upholding the department's decision to discontinue the plaintiff's medicaid benefits because the trust was an asset that was available to her and, therefore, her assets exceeded the regulatory limits.[11]

[9] Pursuant to General Statutes § 45a-123, the Probate Court, *Kurmay, J.*, appointed another judge as a committee to hear the matter and report its findings to the court. On June 11, 2001, the committee issued its report to the Probate Court, which adopted the committee's recommendations in its order of June 12, 2001.

[10] The department subsequently appealed from the Probate Court's order to the Superior Court. The appeal currently is pending. See *Dept. of Social Services* v. *Corcoran*, Superior Court, judicial district of Fairfield, Docket No. CV-01-0385178-S (August 7, 2001).

[11] In her ruling on the record, the hearing officer stated: "I rejected and ignored any correspondence sent after June 8, 2001. The record had closed.

The plaintiff subsequently requested reconsideration of the decision pursuant to General Statutes § 4-181a (a) (1) (a).[12] Specifically, the plaintiff claimed that the department should reconsider both the ruling closing the record on June 8, 2001, and the resulting decision in light of the Probate Court's order of June 12, 2001. Her motion was denied.[13] Pursuant to General Statutes §§ 17b-61[14] and 4-183,[15] the plaintiff appealed from the hearing officer's decision to the Superior Court.

I accept no other data into the hearing record." The hearing officer then itemized those materials contained in the record. The Probate Court's order of June 12, 2001, was not included.

[12] General Statutes § 4-181a (a) (1) provides in relevant part: "Unless otherwise provided by law, a party in a contested case may, within fifteen days after the personal delivery or mailing of the final decision, file with the agency a petition for reconsideration of the decision on the ground that: (A) An error of fact or law should be corrected . . . ."

[13] The department also requested a reconsideration of the hearing officer's July 17, 2001 decision, pursuant to § 4-181a (a), to correct its improper reliance on § 40380.80F of the department's Uniform Policy Manual, which applies only to trusts self-funded by the beneficiary. The department's director, Brenda Farrell, granted the request for the purpose of correcting the hearing officer's reliance on § 40380.80F. Thereafter, the hearing officer released a revised decision deleting references to § 40380.80F. The decision was identical in all other respects.

[14] General Statutes § 17b-61 provides in relevant part: "(a) Not later than sixty days after such hearing, or three business days if the hearing concerns a denial of or failure to provide emergency housing, the commissioner or his designated hearing officer shall render a final decision based upon all the evidence introduced before him and applying all pertinent provisions of law, regulations and departmental policy, and such final decision shall supersede the decision made without a hearing, provided final definitive administrative action shall be taken by the commissioner or his designee within ninety days after the request of such hearing pursuant to section 17b-60. Notice of such final decision shall be given to the aggrieved person by mailing him a copy thereof within one business day of its rendition. Such decision after hearing shall be final except as provided in subsections (b) and (c) of this section.

"(b) The applicant for such hearing, if aggrieved, may appeal therefrom in accordance with section 4-183. Appeals from decisions of said commissioner shall be privileged cases to be heard by the court as soon after the return day as shall be practicable. . . ."

[15] General Statutes § 4-183 (a) provides in relevant part: "A person who has exhausted all administrative remedies available within the agency and

In a four count complaint, the plaintiff alleged that the department: (1) improperly applied Connecticut law regarding availability of assets; (2) made factual findings that were clearly erroneous in light of the substantial evidence in the record as a whole; (3) exceeded its statutory authority by improperly excluding the Probate Court's decision; and (4) resolved the issue in a manner contrary to federal law. The trial court rendered judgment dismissing the plaintiff's appeal, concluding that the hearing officer properly determined that the plaintiff was the beneficiary of a general support trust. Additionally, the trial court determined that the hearing officer's decision to exclude the Probate Court's order was not improper. The trial court based this determination on its conclusion that the "findings by the Probate Court do not resolve whether under the statute and regulations administered by the department, the trust is an inaccessible asset."

The plaintiff appealed from the trial court's judgment of dismissal to the Appellate Court. Thereafter, we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

I

On appeal, the plaintiff first claims that the trial court incorrectly concluded that the hearing officer properly refused to consider and give preclusive effect to the order of the Probate Court under the doctrine of collateral estoppel. Specifically, the plaintiff claims that the issue of whether the trust is a supplemental needs trust or a general support trust was litigated fully and fairly in the Probate Court action, which the hearing officer failed to consider. The department responds that the hearing officer did not abuse her discretion in closing the hearing record prior to the issuance of the Probate

who is aggrieved by a final decision may appeal to the Superior Court as provided in this section. . . ."

Court's decision, and further, that the ultimate issue decided by the hearing officer, i.e., whether the trust constituted an asset that was available to the plaintiff, was not identical to the issue decided by the Probate Court and, therefore, the hearing officer was not estopped from construing the trust. We agree with the department that the hearing officer did not abuse her discretion in closing the record and that the issue presented to, and decided by, each tribunal was not identical. The hearing officer, therefore, was not bound by the principles of collateral estoppel.[16]

We begin by setting forth the applicable standard of review. The plaintiff's claim requires us to determine whether the trial court properly declined to invoke the doctrine of collateral estoppel to preclude the hearing officer from construing the trust. This presents a question of law over which our review is plenary. *R & R Pool & Patio, Inc.* v. *Zoning Board of Appeals*, 257 Conn. 456, 466, 778 A.2d 61 (2001) (propriety of application of collateral estoppel is question of law).

The hearing officer closed the record four days before the Probate Court issued its ruling, and in an exercise of her discretion, she declined to consider any further submissions. Our scope of judicial review is limited to determining if the hearing officer "acted unreasonably,

---

[16] The department contends that we should not consider the plaintiff's collateral estoppel claim because it was not raised in the trial court. Specifically, the department maintains that, while the plaintiff argued that the Probate Court's decision should be given preclusive effect before the hearing officer, on appeal to the trial court, the plaintiff merely argued that the hearing officer improperly excluded the Probate Court order. Practice Book § 60-5 provides in relevant part that "[t]he court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. . . ." In the present case, the trial court did address the issue of collateral estoppel in substance by stating that "[t]he plaintiff claims that the hearing officer, who closed the hearing without considering the order of the Probate Court, erred in not recognizing the Probate Court's construction of the trust." We therefore conclude that the issue of collateral estoppel sufficiently was raised in the trial court.

arbitrarily or illegally, or abused [her] discretion."
(Internal quotation marks omitted.) *Cannata* v. *Dept.
of Environmental Protection*, 239 Conn. 124, 139, 680
A.2d 1329 (1996). We cannot say that the hearing offi-
cer's decision to close the record was an abuse of discre-
tion, and accordingly, the ruling of the Probate Court
was not part of the record in this case. Moreover, the
issues decided by the hearing officer and the Probate
Court were not identical, and collateral estoppel there-
fore does not apply.

"The fundamental principles underlying the doctrine
of collateral estoppel are well established. The com-
mon-law doctrine of collateral estoppel, or issue preclu-
sion, embodies a judicial policy in favor of judicial
economy, the stability of former judgments and finality.
. . . Collateral estoppel means simply that when an
issue of ultimate fact has once been determined by a
valid and final judgment, that issue cannot again be
litigated between the same parties in any future lawsuit.
. . . Issue preclusion arises when an issue is actually
litigated and determined by a valid and final judgment,
and that determination is essential to the judgment.
. . . Collateral estoppel express[es] no more than the
fundamental principle that once a matter has been fully
and fairly litigated, and finally decided, it comes to
rest." (Internal quotation marks omitted.) *Cumberland
Farms, Inc.* v. *Groton*, 262 Conn. 45, 58, 808 A.2d
1107 (2002).

"Before collateral estoppel applies [however] there
must be an *identity of issues* between the prior and
subsequent proceedings. To invoke collateral estoppel
the issues sought to be litigated in the new proceeding
must be *identical* to those considered in the prior pro-
ceeding." (Emphasis added.) *Crochiere* v. *Board of
Education*, 227 Conn. 333, 345, 630 A.2d 1027 (1993);
see also *Mazziotti* v. *Allstate Ins. Co.*, 240 Conn. 799,
813, 695 A.2d 1010 (1997) ("[t]he present case presents

a question of issue preclusion, which requires an identity of those issues between the prior and subsequent proceedings"); *Aetna Casualty & Surety Co.* v. *Jones*, 220 Conn. 285, 297, 596 A.2d 414 (1991) ("[i]n order for collateral estoppel to bar the relitigation of an issue in a later proceeding, the issue concerning which relitigation is sought to be estopped must be identical to the issue decided in the prior proceeding"). In other words, "[i]n order for collateral estoppel to apply . . . there must be an *identity* of the issues, that is, the prior litigation must have resolved the *same* legal or factual issue that is present in the second litigation." (Emphasis added; internal quotation marks omitted.) *Connecticut National Bank* v. *Rytman*, 241 Conn. 24, 38, 694 A.2d 1246 (1997). Simply put, "collateral estoppel has no application in the absence of an identical issue." *Gladysz* v. *Planning & Zoning Commission*, 256 Conn. 249, 261, 773 A.2d 300 (2001).

Turning to the facts of the present case, we conclude that, because the issue decided by the Probate Court, namely, that the trust was not available to the plaintiff's *creditors*, is not identical to the issue before the hearing officer, namely, whether the trust constituted an asset available to the *plaintiff*, the hearing officer was not collaterally estopped from construing the trust. Our conclusion is supported by a review of the proceedings before each tribunal.

Although the proceedings before the Probate Court and the hearing officer arose out of the same testamentary instrument, each tribunal was called upon to decide, and did in fact decide, a different issue. The trustees petitioned the Probate Court "to construe the terms of said Trust as they pertain to any rights the State . . . may have to claim *reimbursement* from the Trust for benefits heretofore provided . . . ." (Emphasis added.) Specifically, the trustees requested "a ruling classifying said Trust as a '*special needs*' trust, from

which it is neither appropriate nor required to *reimburse said State* for benefits received . . . ." (Emphasis added.) In response to this petition, the Probate Court determined that the testator intended to create a " 'special needs, discretionary trust,' not otherwise *available to the state . . . or other creditors of the trust beneficiary* for her care and support" and, further, that "[t]he trust assets are not available to the claims of the state . . . for past or future care . . . ."[17] (Emphasis added.)

The hearing officer, however, conducted the administrative hearing, at the plaintiff's request, to determine whether the department properly discontinued the plaintiff's medicaid benefits. In concluding that the termination was proper, the hearing officer determined that the trust was an "asset available to the *plaintiff*" under the regulations and policies of the department. (Emphasis added.)

We acknowledge that there was some area of overlap in the issues presented in the two proceedings. As we previously have noted, however, the linchpin of collateral estoppel is the identity of the issues decided by both tribunals, and, in the present case, we are not persuaded that the issues are identical. The Probate Court determined, in the context of a potential reimbursement claim, that the trust was not available to the plaintiff's creditors and the state, whereas the hearing officer determined that the trust was an asset available to the plaintiff that disqualified her from receiving medicaid benefits. The Probate Court's opinion is notable for what it did not conclude, namely, whether the plaintiff had a legal right to compel distribution from the

---

[17] We are mindful that, in its order, the Probate Court described its duty "to construe the will of the [testator] in the context of the trust's vulnerability to the claims of the . . . [department] that the trust assets were 'available' to the [plaintiff]." The Probate Court, however, did not phrase its order or its analysis in terms of availability to the plaintiff.

trust. As we discuss more fully in part II of this opinion, for the purposes of determining eligibility for the medicaid program, "only assets *actually available to a medical assistance recipient* may be considered . . . ." (Emphasis altered.) *Zeoli* v. *Commissioner of Social Services*, 179 Conn. 83, 94, 425 A.2d 553 (1979). Assets held in trust are considered available if the beneficiary has the legal right to compel distributions. See General Statutes § 17b-261 (c). Therefore, although the Probate Court determined that the trust is not available to the *state* as a potential creditor, it did not consider whether the trust is available to the plaintiff as a matter of law. As the trial court aptly noted, "[t]hese findings by the Probate Court do not resolve whether under the statutes and regulations administered by the department the trust is an inaccessible asset" as to the plaintiff. In other words, the hearing officer was not estopped from construing the trust in relation to the plaintiff's rights because the Probate Court's decision did not address the plaintiff's rights to the trust. We therefore conclude that the trial court properly determined that the hearing officer was not collaterally estopped from construing the trust.

The plaintiff maintains that the hearing officer was estopped from relitigating the proper characterization of the trust because the identical issue, the availability of the trust to the plaintiff, was "necessarily determined" by the Probate Court's decision. We disagree.

Even if we were to assume, for the purpose of argument, that the issue presented to the Probate Court was the same as the issue before the hearing officer, that issue, i.e., the availability of the trust to the plaintiff, was not necessarily determined by the Probate Court. We note that the Probate Court classified the trust at issue as a "special needs, discretionary trust . . . ." We are unable, from this characterization, to determine what the Probate Court intended to conclude regarding

the availability of the trust to the plaintiff. A special needs trust is defined by 42 U.S.C. § 1396p (d) (4) (A) as follows: "A trust containing the assets of an individual under age 65 who is disabled . . . and which is established for the benefit of such individual by a parent, grandparent, legal guardian of the individual, or a court *if the State will receive all amounts remaining in the trust upon the death of such individual* up to an amount equal to the total medical assistance paid on behalf of the individual . . . ." (Emphasis added.) In the present case, the trust in question cannot be a special needs trust because upon the plaintiff's death, the trustees will become the trust's beneficiaries. Furthermore, the phrase "discretionary trust" is ambiguous. This court previously has used this phrase to describe trusts in which the settlor is also the beneficiary; *Forsyth* v. *Rowe*, 226 Conn. 818, 829, 629 A.2d 379 (1993); *Greenwich Trust Co.* v. *Tyson*, 129 Conn. 211, 222, 27 A.2d 166 (1942); as well as trusts in which the trustee has discretion to make distributions or to accumulate income. See, e.g., *Bridgeport* v. *Reilly*, 133 Conn. 31, 39, 47 A.2d 865 (1946) ("a trustee, in determining whether to make expenditures under a discretionary trust for support, is entitled to take into consideration other means of support available to the beneficiary"). This phrase alone, however, does not indicate the precise level of discretion conferred upon the trustee, the determination of which, in this case, is essential to identifying the availability of the trust's funds to the plaintiff. Accordingly, we cannot conclude that the Probate Court's characterization of the trust as a "special needs, discretionary trust" necessarily determined the issue in the present case, namely, whether the trust was an asset available to the plaintiff.

Moreover, we note that previous decisions by this court, and their underlying public policy, counsel against the plaintiff's interpretation. This court pre-

viously has recognized "that the application of the collateral estoppel doctrine has dramatic consequences for the party against whom the doctrine is applied. [Therefore] [c]ourts should be careful that the effect of the doctrine does not work an injustice. In applying the doctrine, the court must specifically determine that an issue that is presented in the second case was necessary to the judgment in the first case . . . and that the broader purposes of the doctrine are satisfied." (Citation omitted.) *Gladysz* v. *Planning & Zoning Commission*, supra, 256 Conn. 261–62. "Thus, [t]he doctrines of preclusion . . . should be flexible and must give way when their mechanical application would frustrate other social policies based on values equally or more important than the convenience afforded by finality in legal controversies." (Internal quotation marks omitted.) *Cumberland Farms, Inc.* v. *Groton*, supra, 262 Conn. 59–60.

Because we have recognized that applying the doctrine of collateral estoppel has harsh consequences, namely, cutting off a party's right to future litigation on a given issue, we have been reluctant to uphold the invocation of the doctrine unless the issues are completely identical. See, e.g., *Rocco* v. *Garrison*, 268 Conn. 541, 556, 848 A.2d 352 (2004) (declining to apply doctrine because issues presented were not identical); *Cumberland Farms, Inc.* v. *Groton*, supra, 262 Conn. 62 (declining to apply doctrine due to deferential standard of review in initial proceeding); *R & R Pool & Patio, Inc.* v. *Zoning Board of Appeals*, supra, 257 Conn. 464–65 (Appellate Court improperly concluded that parties were estopped from litigating definition of "fine furniture" in cease and desist action because it was necessarily determined in previous proceeding); *Gladysz* v. *Planning & Zoning Commission*, supra, 256 Conn. 261 (issues not sufficiently identical for collateral estoppel to serve as bar); *Nancy G.* v. *Dept. of Chil-*

*dren & Families*, 248 Conn. 672, 682, 733 A.2d 136 (1999) (declining to apply collateral estoppel based on inference to be drawn from initial proceeding); *Connecticut National Bank* v. *Rytman*, supra, 241 Conn. 40 (issues not sufficiently identical to warrant issue preclusion); *Crochiere* v. *Board of Education*, supra, 227 Conn. 344–46 (finding in employment termination proceeding does not preclude future litigation on issue of wilful misconduct under doctrine of collateral estoppel).

In the present case, if we were to accept the plaintiff's claim, as adopted by the dissent, we would be premising the application of the doctrine of collateral estoppel on a mere inference. As we previously have discussed, the issues were not, on their face, identical. The plaintiff argues, and the dissent agrees, however, that by resolving the issue of creditors' rights, the Probate Court necessarily determined the rights of the plaintiff. This claim is premised on the unproven, implicit assertion that a creditor enjoys the same rights to a trust as a beneficiary. In other words, the plaintiff asks us to infer the rights of the plaintiff from the Probate Court's decision regarding the rights of creditors. We are unwilling to do so. In this case, the addition of an inferential step is sufficient to negate the required identity of the issues. See, e.g., *Nancy G.* v. *Dept. of Children & Families*, supra, 248 Conn. 682 (declining to infer from adoption order that child had been "placed" within meaning of statute for collateral estoppel purposes); *Crochiere* v. *Board of Education*, supra, 227 Conn. 344–46 (issue of wilful misconduct was not necessarily determined by termination hearing).[18]

---

[18] The dissenting opinion disagrees with our conclusion that acceptance of the plaintiff's claim requires an intermediate inferential step. Instead, the dissenting opinion maintains that the plaintiff's claim is properly premised on an "inescapable implication . . . ." Regardless of the nomenclature employed, the fact remains that collateral estoppel is intended to preclude litigation when an *identical* issue previously has been decided. If an "inference" or "implication" is needed to equate the contested issues, they are not

Contrary to the conclusion reached by the dissent, the rights of the beneficiary and a creditor of the beneficiary are not in lockstep. It is true that "[a] transferee or creditor of a trust beneficiary cannot compel the trustee to make discretionary distributions if the beneficiary personally could not do so." 2 Restatement (Third), Trusts § 60, comment (e), p. 409 (2003). Thus, if the beneficiary does not have a right to access freely the assets of the trust, a creditor is likewise precluded from reaching those assets. The converse, however, does not necessarily follow. The right of a creditor to reach the trust is not determinative of the right of the beneficiary to do so. It is possible for a trustee to be ordered to make payment to the beneficiary even when the creditor cannot similarly force payment from the trust. "[A] trustee's refusal to make distributions might not constitute an abuse [of discretion] as against an assignee or creditor even when, under the standards applicable to the power, a decision to refuse distributions to the beneficiary might have constituted an abuse in the absence of the assignment or attachment. This is because the extent to which the designated beneficiary might actually benefit from a distribution is relevant to the justification and reasonableness of the trustee's decision in relation to the settlor's purposes and the effects on other beneficiaries." Id. This court considers the rights of a trust beneficiary to be distinct from the rights of the beneficiary's creditor. In *Bridgeport-City Trust Co.* v. *Beach*, 119 Conn. 131, 139–41, 174 A. 308 (1934), this court considered as separate questions the beneficiary's right to access the principal of a support trust and a creditor's ability to reach the beneficiary's trust income.

This court's decision in *Zeoli* further undermines the dissenting opinion's conclusion that "[a] creditor's

sufficiently identical to warrant the application of the doctrine of collateral estoppel, with its harsh results.

rights to reach the assets of a trust are coextensive with a beneficiary's right to reach those assets . . . ." In *Zeoli*, this court undertook a two part analysis. *Zeoli* v. *Commissioner of Social Services*, supra, 179 Conn. 86. First the court analyzed the right of a creditor to reach the assets held in trust for the beneficiaries. Id., 88. Second, after determining that a creditor could *not* access the trust funds, the court nevertheless went on to consider whether funds were available to the beneficiaries. Id., 91. The fact that this court independently analyzed both the rights of a creditor and the rights of the beneficiaries strongly suggests that their rights are not, as the dissenting opinion claims, coextensive. Were the dissent correct, it would have been wholly unnecessary for this court to analyze separately the beneficiaries' right to the trust assets after the court first determined that a creditor could not reach those assets.

In addition, the doctrine of collateral estoppel is based on notions of judicial economy, such that "where a party has fully and fairly litigated his claims, he may be barred from future actions on matters not raised in the prior proceeding. But the scope of matters precluded necessarily depends on what has occurred in the former adjudication." (Internal quotation marks omitted.) *Isaac* v. *Truck Service, Inc.*, 253 Conn. 416, 423, 752 A.2d 509 (2000). The application of collateral estoppel "should be flexible and must give way when [its] mechanical application would frustrate other social policies based on values equally or more important than the convenience afforded by finality in legal controversies." (Internal quotation marks omitted.) Id. In the present case, where the two decisions were reached nearly simultaneously, there is no strong reason to afford one precedence over the other. Thus, under the circumstances of the present case, giving precedence to the decision of the Probate Court would be an unwar-

ranted and inflexible application of the doctrine of collateral estoppel.

## II

The plaintiff next claims that the trial court improperly affirmed the hearing officer's conclusion that the trust was an asset available to the plaintiff as defined by relevant medicaid regulations. Specifically, the plaintiff claims that the testator intended to create a discretionary, supplemental needs trust, the assets of which should not be considered available for medicaid purposes. The department, however, contends that the testamentary language indicates that the testator intended the trust to provide for the plaintiff's general support, in which case it would constitute an asset available to the plaintiff. We agree with the department that the testator intended to create a general support trust and, therefore, we further agree that the trust corpus and income properly may be considered to be available to the plaintiff for the purpose of determining medicaid eligibility.

We begin by setting forth our applicable standard of review. Resolution of this issue requires us to determine whether the hearing officer properly construed the terms of the trust instrument. "The construction of a will presents a question of law . . . ." (Internal quotation marks omitted.) *Canaan National Bank* v. *Peters*, 217 Conn. 330, 335, 586 A.2d 562 (1991). As we previously have stated, "[w]ith respect to questions of law, [w]e have said that [c]onclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts." (Internal quotation marks omitted.) *Board of Education* v. *Commission on Human Rights & Opportunities*, 266 Conn. 492, 504, 717 A.2d 1276 (2003).

This court has stated that, "[u]nder applicable federal law, only assets *actually available to a medical assistance recipient* may be considered by the state in determining eligibility for public assistance programs such as title XIX [medicaid]. . . . A state may not, in administering the eligibility requirements of its public assistance program pursuant to title XIX . . . presume the availability of assets not actually available . . . ." (Citations omitted; emphasis altered.) *Zeoli* v. *Commissioner of Social Services*, supra, 179 Conn. 94. This principle "has served primarily to prevent the States from conjuring fictional sources of income and resources or imputing financial support from persons who have no obligation to furnish it or by overvaluing assets in a manner that attributes nonexistent resources to recipients." *Heckler* v. *Turner*, 470 U.S. 184, 200, 105 S. Ct. 1138, 84 L. Ed. 2d 138 (1985).

"For the purposes of determining eligibility for the [m]edicaid program, an available asset is one that is actually available to the applicant or one that the applicant has the legal right, authority or power to obtain or to have applied for the applicant's general or medical support. If the terms of a trust provide for the support of an applicant, the refusal of a trustee to make a distribution from the trust does not render the trust an unavailable asset." General Statutes § 17b-261 (c). For medicaid purposes, general support trusts are considered available because a beneficiary can compel distribution of the trust income. See General Statutes § 52-321.[19] In other words, the beneficiary has a "legal right

---

[19] General Statutes § 52-321 provides in relevant part: "Except as provided in sections 52-321a and 52-352b:

"(a) If property has been given to trustees to pay over the income to any person, without provision for accumulation or express authorization to the trustees to withhold the income, and the income has not been expressly given for the support of the beneficiary or his family, the income shall be liable in equity to the claims of all creditors of the beneficiary. . . .

"(d) If any such trust has been expressly provided to be for the support of the beneficiary or his family, a court of equity having jurisdiction may

. . . to obtain" the funds. See General Statutes § 17b-261 (c). Conversely, supplemental needs trusts, in which a trustee retains unfettered discretion to withhold the income, are not considered available to the beneficiary. *Connecticut Bank & Trust Co.* v. *Hurlbutt*, 157 Conn. 315, 327, 254 A.2d 460 (1968) (spendthrift trust not open to alienation or assignment by anyone until income paid over to beneficiary); *Bridgeport-City Trust Co.* v. *Beach*, supra, 119 Conn. 141 (beneficiary may not alienate or assign interest of spendthrift trust).

"It is well settled that in the construction of a testamentary trust, the expressed intent of the testator must control. This intent is to be determined from reading the instrument as a whole in the light of the circumstances surrounding the testator when the instrument was executed, including the condition of his estate, his relations to his family and beneficiaries and their situation and condition." *Gimbel* v. *Bernard F. & Alva B. Gimbel Foundation, Inc.*, 166 Conn. 21, 26, 347 A.2d 81 (1974). Therefore, in determining whether the assets of a testamentary trust are available to a beneficiary, this court considers whether the testator intended to create a supplemental needs trust or a general support trust. See *Zeoli* v. *Commissioner of Social Services*, supra, 179 Conn. 91–92.

The leading case in this state on trust construction in relation to medicaid eligibility is *Zeoli*. In that case, the plaintiffs, two mentally disabled sisters, appealed from the department of social services' decision to terminate their medicaid benefits for having excess assets in the form of a testamentary trust devised to them by their father. Id., 84–85. The language of the bequest granted the trustee "absolute and uncontrolled discretion" to make distributions to either daughter, "regard-

---

make such order regarding the surplus, if any, not required for the support of the beneficiary or his family, as justice and equity may require. . . ."

less of whether any one of my daughters may be totally deprived of any benefit hereunder." (Internal quotation marks omitted.) Id., 86–87 n.2. The trust instrument further provided that "[w]ithout in any way limiting the absolute discretion of my Trustee, it is my fond hope that my trustee pay or apply the net income or principal of the trust for the maintenance, support, education, health and general welfare of . . . my daughters . . . ." (Internal quotation marks omitted.) Id. This court, after analyzing the testamentary language, concluded that "the testator's intent was to provide the trustee with sufficient flexibility to use the funds under the trust solely for supplemental support." Id., 90. Therefore, "[s]ince the assets held in the spendthrift trust were not intended for the plaintiffs' general support, they could not compel their distribution" and the trust corpus and income could not be considered available. Id., 92.

Although the factual posture of the present case is similar to *Zeoli*, notably, the testamentary language reflective of the testators' intent is not. In the present case, the trust instrument manifests the testator's unambiguous intent to create a general support trust whereas the *Zeoli* trust unequivocally indicated the testator's intent to provide for the beneficiaries' supplemental needs. In *Zeoli*, the trust instrument was replete with references to the "absolute and uncontrolled discretion" afforded the trustees in their decision-making process. See id., 86–87 n.2. In addition to the overt references to the unfettered discretion of the trustees, the court in *Zeoli* deemed the provision authorizing the trustee to discriminate among the beneficiaries when making distributions highly probative of the vast level of discretion the testator intended to confer on the trustee. See id., 90. In the present case, however, the testator granted the trustees "sole discretion" to make distributions and provided them with factors to con-

sider when making "discretionary distributions . . . ."[20] This language is not as strong as that used in *Zeoli* and suggests that the testator in the present case intended to confer a lesser amount of discretion. See, e.g., *Kolodney* v. *Kolodney*, 6 Conn. App. 118, 121–22, 503 A.2d 625 (1986) (distinguishing "absolute discretion" from "sole discretion"); *Gimbel* v. *Bernard F. & Alva B. Gimbel Foundation, Inc.*, supra, 166 Conn. 27–28 (trust instrument providing for "sole, absolute and uncontrolled discretion" recognized by court as having "imparted to the trustees the widest possible discretion").

The principal distinction between *Zeoli* and the present case, however, is the manner in which the respective testators expressed their intentions regarding the use of the trust funds. In *Zeoli*, after establishing the trust, the testator provided in his will that *"it is my fond hope* that my trustee pay or apply the net income or principal of the trust for the maintenance, support, education, health and general welfare of [the beneficiaries] . . . ."* (Emphasis added; internal quotation marks omitted.) *Zeoli* v. *Commissioner of Social Services*, supra, 179 Conn. 86–87 n.2. The court interpreted this to mean that "[t]he combination of express and precatory terms in the will attempts to grant the trustee flexibility to provide the support that would benefit either of the beneficiaries the most, that is, imposing on the trustee the legal duty to furnish only supplementary support."

---

[20] The plaintiff makes much of the fact that the testator authorized the trustees to consider the "advisability of *supplementing* such income or assets" in making distributions. (Emphasis added.) To the extent that the plaintiff claims that the mere use of the word "supplement" creates a supplemental needs trust, we disagree. As we already have noted, the testator's intent is "determined from reading the instrument *as a whole* in the light of the circumstances surrounding the testator when the instrument was executed . . . ." (Emphasis added.) *Gimbel* v. *Bernard F. & Alva B. Gimbel Foundation, Inc.*, supra, 166 Conn. 26. Therefore, the use of the word "supplement" *is not* dispositive of the issue.

Id., 91. In the present case, the testator created the trust with the following language: "If [the plaintiff] is then living, the trust established for her shall be retained by my trustees to hold, manage, invest and reinvest said share as a Trust Fund, paying to or expending for the benefit of [the plaintiff] so much of the net income and principal of said Trust as the Trustees, *in their sole discretion, shall deem proper for her health, support in reasonable comfort, best interests and welfare . . . .*" (Emphasis added.) Thus, the trustees' "sole discretion" is limited by the ascertainable standard of the plaintiff's "health, support in reasonable comfort, best interests and welfare . . . ." See, e.g., *Kolodney* v. *Kolodney,* supra, 6 Conn. App. 121 ("plaintiff's discretion limited by a standard, that of comfortable maintenance, support and education" [internal quotation marks omitted]). Put simply, whereas the testator in *Zeoli* imbued his trustees with "absolute and uncontrolled discretion" and noted his mere *desire* that the trust be used for the maintenance and support of the beneficiaries; *Zeoli* v. *Commissioner of Social Services,* supra, 86–87 n.2; the testator in the present case created the trust for the purpose of supporting the plaintiff "in reasonable comfort . . . ." See, e.g., *Kolodney* v. *Kolodney,* supra, 122 ("[i]t is clear from the testator's use of the comfortable maintenance, support and education standard that the trustee's discretion was not intended to be absolute" [internal quotation marks omitted]). Absent the requisite testamentary intent to provide only for the plaintiff's supplemental needs, we agree with the department and conclude that the trust in question is a general support trust. Therefore, we conclude that the trial court correctly determined that the hearing officer properly concluded that the trust corpus and income were available to the plaintiff for the purpose of determining her medicaid eligibility.[21]

---

[21] The plaintiff's reliance on *Bridgeport* v. *Reilly,* supra, 133 Conn. 31, is equally unavailing. In that case, this court affirmed the trial court's decision prohibiting the city of Bridgeport, as a creditor, from seeking reimbursement

## III

The plaintiff's final claim on appeal is that the hearing officer improperly excluded extrinsic evidence probative of the testator's intent. Specifically, the plaintiff argues that the hearing officer should have admitted into evidence an affidavit from the attorney who had drafted the trust. We are not persuaded.

As we previously noted in part II of this opinion, "[w]ith respect to questions of law, [w]e have said that [c]onclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts." (Internal quotation marks omitted.) *Board of Education* v. *Commission on Human Rights & Opportunities*, supra, 266 Conn. 504.

The plaintiff relies on *Erickson* v. *Erickson*, 246 Conn. 359, 370 n.10, 716 A.2d 92 (1998), citing *Fulton Trust Co.* v. *Trowbridge*, 126 Conn. 369, 372, 11 A.2d 393 (1940), for the proposition that "extrinsic evidence may be admitted to prove a testator's intent where the language of the will is ambiguous." Even if we were to assume that the plaintiff correctly characterizes our law regarding the use of extrinsic evidence to prove testamentary intent, her argument nevertheless fails because she has failed to identify any language in the

for the hospitalization of the plaintiff, who was mentally insane, from the trust of which he was a beneficiary. Id., 32. It is axiomatic that creditors have limited access to spendthrift trusts. See General Statutes § 52-321. Moreover, the ability of the state to reach the trust funds is not the proper inquiry in this particular case. Rather, the dispositive issue is the availability of the trust funds to the plaintiff.

will that is ambiguous.[22] Our own review of the will reveals no ambiguity, and we therefore conclude that the trial court properly affirmed the hearing officer's exclusion of the affidavit.[23]

The judgment is affirmed.

In this opinion BORDEN and KATZ, Js., concurred.

ZARELLA, J., with whom SULLIVAN, C. J., joins, dissenting. The majority concludes that the trial court properly determined that the doctrine of collateral estoppel did not preclude the administrative hearing officer's construction of the trust. Because I disagree with this conclusion and because the applicability of the doctrine of collateral estoppel is dispositive in this case, I respectfully dissent.

I will set forth the relevant facts of this case for the sake of clarity, recognizing that my review of the facts may repeat portions of the facts contained in the majority opinion. On November 3, 1987, the testator, Lyman M. Corcoran, executed a will that took effect on May 29, 1989, the date of his death. The will contained a provision that created a trust fund for the benefit of the plaintiff, Pamela D. Corcoran. The testator appointed the plaintiff's two sisters, Robin C. Turek and Imogen J.C. Kellogg, as trustees.[1]

---

[22] To the extent that the plaintiff argues that the language of the testator's will is ambiguous as to whether the trust was intended for the plaintiff's general support or supplemental needs, we note that "the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." (Internal quotation marks omitted.) *United Illuminating Co.* v. *Wisvest-Connecticut, LLC*, 259 Conn. 665, 670, 791 A.2d 546 (2002).

[23] The plaintiff also claims that the affidavit should be admitted to show the circumstances that existed at the time the will was drafted. Again, the plaintiff has failed to demonstrate the existence of an ambiguity, which is a necessary predicate for consideration of extrinsic evidence of the testator's intent.

[1] I hereinafter refer to Turek and Kellogg collectively as the trustees.

After the testator's death, the plaintiff applied for and received medicaid benefits, which commenced on November 28, 1989.[2] On February 26, 2001, the defendant, the department of social services (department), discontinued these benefits, effective March 31, 2001, when it determined that the plaintiff was ineligible for assistance because her "available assets" from the trust exceeded the prescribed limits.

On February 13, 2001, approximately two weeks prior to the department's discontinuation of the plaintiff's benefits, the trustees petitioned the Probate Court to construe the terms of the trust to determine whether the trust assets were "vulnerab[le] to the claims of the . . . [department] that the trust assets were 'available' to the [plaintiff]." The department, the trustees and the plaintiff were parties to the Probate Court proceeding and participated in the hearing on this matter on May 4, 2001.

The Probate Court thereafter issued its order on June 12, 2001. In its order,[3] the Probate Court concluded that "[t]he trust at issue is . . . a 'special needs, discretionary trust' not otherwise available to the state of Connecticut or other creditors of the trust beneficiary [i.e., the plaintiff] for her care and support." The court further concluded that "[t]he trustees have the authority and power to consider all other sources of principal and income, other than those of the trust, including payments by the state of Connecticut and others, before utilizing the assets of the trust for the [plaintiff's] benefit." The court therefore determined that "[t]he trust assets are not available to the claims of the state of Connecticut for past or future care, except as specifi-

---

[2] The defendant, the department of social services, made the benefits effective retroactively to June 1, 1988.

[3] The Probate Court, *Kurmay, J.*, appointed *Capuano, J.*, as a committee, pursuant to General Statutes § 45a-123, and incorporated the committee's written report by specific reference in its order.

cally authorized and approved by the trustees in their sound discretion."

On March 28, 2001, before the Probate Court issued its order but after the trustees had commenced the action in the Probate Court, the plaintiff appealed from the department's decision to discontinue her medicaid benefits to an administrative hearing officer (hearing officer). Both the department and the plaintiff were parties to this appeal and participated in the hearings held on April 26, 2001, and May 31, 2001.

On July 12, 2001, one month after the Probate Court had issued its order, the hearing officer issued a ruling on the hearing record, in which she declared: "I rejected and ignored any correspondence sent after June 8, 2001. The record had closed." The hearing officer therefore did not consider in her decision the June 12, 2001 order of the Probate Court construing the trust.[4]

Subsequently, on July 17, 2001, the hearing officer rendered her decision upholding the department's discontinuation of the plaintiff's medicaid benefits because she determined that the plaintiff's share of the trust qualified as an "asset available" to her for purposes of medicaid eligibility.[5] Thereafter, on July 23, 2001, the department filed a request for reconsideration of the July 17 decision on the basis of the hearing officer's erroneous reliance on a regulation in that decision. The request was granted, and the hearing officer issued an amended decision on August 20, 2001.[6]

---

[4] The hearing officer was aware that the trustees sought to have the Probate Court construe the trust.

[5] The plaintiff requested reconsideration of the July 12 ruling and July 17 decision, claiming that "the department should reconsider the decisions due to new evidence which has become available since June 8, 2001, the [effective] date the hearing record was closed." The department director denied the request, however.

[6] The hearing officer stated that the August 20, 2001 decision "replaces the decision issued on July 17, 2001."

In her amended decision, the hearing officer found that "[t]he [plaintiff] did not have a disabling impairment at the time [the testator] signed his will," and that "[t]he income and/or corpus of the trust are available for the [plaintiff's] use or benefit." The hearing officer determined that "[t]he trustees can make or have made payments from the trust to or on behalf of the [plaintiff]," and, therefore, that "[t]he trust is not exempt from consideration as an asset in determining the [plaintiff's] ongoing eligibility for assistance from the [department]." The hearing officer further determined that the plaintiff's trust assets exceeded the maximum allowed for medicaid eligibility and that the department properly had discontinued her benefits. In conclusion, the hearing officer stated that, "by their actions and imputed intentions, the trustees have shown circumstances under which they can and will make a payment from the trust to or on behalf of the [plaintiff]," and, "[u]nder the regulations . . . I find that the trust is an asset available to the [plaintiff]."

The plaintiff appealed from the adverse decision of the hearing officer to the trial court, which affirmed the hearing officer's decision. The plaintiff then appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

The majority concludes that "the issue presented to, and decided by, each tribunal was not identical" and that "[t]he hearing officer, therefore, was not bound by the principles of collateral estoppel." The record reveals, however, that the parties litigated, and the two tribunals necessarily decided, the same issue.

As this court previously has observed, "[t]he common-law doctrine of collateral estoppel, or issue preclusion, embodies a judicial policy in favor of judicial

economy, the stability of former judgments and finality. . . . Collateral estoppel means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit. . . . Issue preclusion arises when an issue is actually litigated and determined by a valid and final judgment, and that determination is essential to the judgment. . . . *Cumberland Farms, Inc.* v. *Groton*, 262 Conn. 45, 57–58, 808 A.2d 1107 (2002). . . . An issue is actually litigated if it is properly raised in the pleadings or otherwise, submitted for determination, and in fact determined. . . . *An issue is necessarily determined if, in the absence of a determination of the issue, the judgment could not have been validly rendered.* . . . If an issue has been determined, but the judgment is not dependent upon the determination of th[at] issue, the parties may relitigate the issue in a subsequent action." (Emphasis added; internal quotation marks omitted.) *DaCruz* v. *State Farm Fire & Casualty Co.*, 268 Conn. 675, 686, 846 A.2d 849 (2004).

This court also has maintained that, "[i]n order for collateral estoppel to bar the relitigation of an issue in a later proceeding, the issue concerning which relitigation is sought to be estopped must be identical to the issue decided in the prior proceeding. . . . '[T]he court must determine what facts were necessarily determined in the first trial, and must then assess whether the [party] is attempting to relitigate those facts in the second proceeding.' " *Aetna Casualty & Surety Co.* v. *Jones*, 220 Conn. 285, 297, 596 A.2d 414 (1991), quoting *State* v. *Hope*, 215 Conn. 570, 584, 577 A.2d 1000 (1990), cert. denied, 498 U.S. 1089, 111 S. Ct. 968, 112 L. Ed. 2d 1054 (1991); see also *State* v. *Joyner*, 255 Conn. 477, 490, 774 A.2d 927 (2001). "We review collateral estoppel claims de novo." *State* v. *Joyner*, supra, 490.

## I

I first examine whether the hearing officer's finding concerning the availability of trust assets to the plaintiff was "necessarily determined in the first [proceeding], and . . . then assess whether the [department] is attempting to relitigate [this issue] in the second proceeding." *Aetna Casualty & Surety Co.* v. *Jones*, supra, 220 Conn. 297.

According to the majority, the issue raised in the administrative hearing was "whether the trust constituted an asset available to the plaintiff . . . ." The majority characterizes the issue before the Probate Court as whether "the trust was not available to the plaintiff's creditors . . . ." The majority determines that the issues are different because one concerns a creditor's right to reach the trust assets whereas the other involves the plaintiff's right to reach the trust assets. The majority also insists that "[t]he Probate Court's opinion is notable for what it did not conclude, namely, whether the plaintiff had a legal right to compel distribution from the trust," and that, "although the Probate Court determined that the trust is not available to the state as a potential creditor, it did not consider whether the trust is available to the plaintiff as a matter of law." Accordingly, the majority concludes that "the hearing officer was not estopped from construing the trust in relation to the plaintiff's rights because the Probate Court's decision did not address the plaintiff's rights to the trust." I respectfully disagree with the majority.

The majority concedes that the department "urged the [Probate Court] not to proceed with the hearing scheduled for May 4, 2001," because "it already had litigated this 'exact issue,' namely, the proper construction of the trust, before the hearing officer . . . ."

Indeed, the regulation[7] upon which the hearing officer based her conclusions underscores the symmetry of the issues necessarily determined because the factors that a hearing officer must consider in assessing medicaid eligibility if the potential recipient is a trust beneficiary are comparable to the factors that a court examines in construing the nature of a trust. See, e.g., *Zeoli* v. *Commissioner of Social Services*, 179 Conn. 83, 90–91, 425 A.2d 553 (1979) (factors to be considered include language of trust and circumstances surrounding its execution, degree of discretion afforded to trustee and value of trust). Therefore, just as the Probate Court was required to determine whether "the trust assets were 'available' to [the plaintiff]," the hearing officer, too, was required to decide "whether the corpus, or principal of such a trust [was] an [asset] available" to the plaintiff. Dept. of Social Services, Uniform Policy Manual, index 4030.80 (B) (1).

The majority further concedes that the Probate Court recognized its duty, in the court's own words, "to con-

[7] Index 4030.80 (B) of the Uniform Policy Manual of the department of social services provides: "1. The Department determines whether the corpus, or principal of such a trust is an available asset by referring to the terms of the trust and the applicable case law construing similar instruments.

"2. The principal of such a trust is an available asset to the extent that the terms of the trust entitle the individual to receive trust principal or to have trust principal applied for his or her general or medical support.

"3. Under circumstances described in subparagraph 2 above, the trust principal is considered an available asset if the trustee's failure to distribute the principal for the benefit of the individual in accordance with the terms of the trust would constitute an abuse of discretion by the trustee.

"4. The Department considers the following factors in determining whether the trustee would be abusing his or her discretion by refusing to distribute trust principal to the individual:

"a. the clarity of the settlor's intention to provide for the general or medical support of the individual; and

"b. the degree of discretion afforded to the trustee; and

"c. the value of the trust created, with a higher dollar value tending to indicate an intent to provide for general or medical support; and

"d. the history of trust expenditures prior to the filing of an application for assistance for or on behalf of the individual."

strue the will of the [testator] in the context of the trust's vulnerability to the claims of the . . . [department] *that the trust assets were 'available' to the [plaintiff].*" (Emphasis added.) The majority, however, dismisses the Probate Court's statement of the issue to be decided because "[t]he Probate Court . . . did not phrase its order or its analysis in terms of availability to the plaintiff." Footnote 17 of the majority opinion.[8]

I believe that the majority misconstrues the Probate Court's order. In its order, the Probate Court expressly adopted the findings and recommendations of the committee,[9] which reasoned that the trustees could not consider making a distribution for the plaintiff's past or future care and support without taking into account all of the plaintiff's other income and assets, including any public welfare benefits to which the plaintiff was entitled.[10] The Probate Court's determination that the

---

[8] The trust document describes the relationship between the testator, the trustees and the plaintiff only; it does not bind third parties, such as the department, in any manner, nor does it grant any rights to them. This is precisely why, in any analysis of a creditor's right to reach the assets of a trust, the initial and necessary issue that the court must determine is the extent of the beneficiary's right to access the trust assets, and it is this determination that requires the court to construe the trust document.

Despite this fact, the majority states that the Probate Court did not determine the nature of the plaintiff's right to access the trust assets but only determined the rights of the plaintiff's creditors to reach those assets. If the majority's assertion is correct, however, then there would be no need to analyze the trust language to determine the plaintiff's right to access the trust assets, as the majority does in part II of its opinion.

[9] See footnote 3 of this opinion.

[10] The committee's report provides in relevant part: "[T]he [testator's] will . . . outlines factors which the trustees are directed to consider before [they] may exercise . . . discretion, including other income and assets available to the [plaintiff]. In its post-hearing brief, [the department] alleges that the trust fails to mention that the trustees are to consider whether [the plaintiff] receives public welfare benefits prior to distributing funds to her or for her benefit from the trust. The compelling inference to be drawn from that argument is that such benefits are not to be considered as income or assets available to the beneficiary which the trust does contemplate. The committee is of the opinion that [the public welfare] benefits were *precisely* why the testator created the trust in the manner set forth in his will. . . .

trust assets were not available to the claims of the department or other creditors thus was based upon the Probate Court's finding that the trust assets were not available to the plaintiff.

The majority suggests that the dissent is concluding that "[t]he right of a creditor to reach the trust is . . . *determinative* of the right of the beneficiary to do so." (Emphasis added.) That is not the case. I merely agree with the well established principle that "[a] transferee or creditor of a trust beneficiary cannot compel the trustee to make discretionary distributions if the beneficiary personally could not do so." 2 Restatement (Third), Trusts § 60, comment (e), p. 409 (2003). A creditor's rights to reach the assets of a trust are coextensive with a beneficiary's right to reach those assets; that is, the creditor has no greater rights to the trust assets than the beneficiary possesses. See, e.g., *Loeb* v. *Loeb*, 261 Ind. 193, 205, 301 N.E.2d 349 (1973) ("[i]f the beneficiary himself cannot compel the trustee to pay over any part of the trust fund, his assignee and his creditors are in no better position" [internal quotation marks omitted]); IIA A. Scott, Trusts (4th Ed. 1987) § 155, pp. 153–54 (same); see also G. Bogert, Trusts and Trustees (2d Ed. Rev. 1992) § 228, pp. 525–26 ("Until the trustee elects to make a payment the beneficiary has a mere expectancy. Nor can a creditor compel the trustee to exercise his discretion to make payments. If . . . [the beneficiary's] creditors seek to take [the beneficiary's interest], before the trustee has made an election to pay or apply, the . . . creditor has no remedies against

---

[I]t is difficult to comprehend why [the department] would consider its benefits something apart from income and assets available to a beneficiary, particularly as such benefits are, among others, commonly referred to as *entitlements*." (Emphasis added.) The committee then recommended that the Probate Court "issue a ruling classifying the trust as a special needs trust and that prior to making distributions, the trustees consider *all* other income and assets [including public welfare benefits] available to or for [the plaintiff]." (Emphasis added.)

the trustee because he stands in the shoes of the beneficiary.").

This court addressed a similar question involving nearly identical facts in *Zeoli* v. *Commissioner of Social Services*, supra, 179 Conn. 83. In *Zeoli*, the defendant commissioner of social services (commissioner) terminated medical assistance payments to the plaintiffs, two mentally handicapped sisters, on the ground that the plaintiffs had assets available to them in excess of the prescribed limits. Id., 84–85. The assets consisted of a joint savings account that was held in the name of the plaintiffs' brother as trustee, with the plaintiffs as beneficiaries. Id., 85. In determining that the savings account constituted an asset of a spendthrift testamentary trust, this court concluded that "[t]he plaintiffs [could not] compel distribution or in any manner alienate the [trust funds] beyond that authorized to be distributed as supplementary support in the trustee's discretion"; id., 95; and, therefore, the commissioner could not terminate the plaintiffs' medical assistance benefits. See id., 97; see also *Carter* v. *Brownell*, 95 Conn. 216, 224, 111 A. 182 (1920) (recognizing that previous cases had "decided . . . that where trustees were given, as in the will before the court, discretionary power to give or [to] withhold from a beneficiary income, he was incapable of alienating it and his creditors could not take it"); *Huntington* v. *Jones*, 72 Conn. 45, 50, 43 A. 564 (1899) ("As the beneficiary could [compel distribution of the trust income], so a creditor of the beneficiary may do it. Equity allows the creditor to avail himself of the interest which the beneficiary has.").[11] Accordingly, in determining a creditor's right

[11] As with creditors, state agencies may not reach assets that are otherwise unavailable to the beneficiary. See, e.g., *Bridgeport* v. *Reilly*, 133 Conn. 31, 36–38, 47 A.2d 865 (1946) (government was not entitled to reimbursement from trust assets of spendthrift trust for expenditures on behalf of beneficiary, who resided in state hospital). Moreover, the department does not claim that its rights are any greater than any other creditor of the plaintiff.

to reach trust assets, this court's precedent and other legal authority inform us that an analysis of the beneficiary's right to compel distribution of the funds is an inherent part of this determination.

The majority states that *Zeoli* undermines the conclusion that the rights of a creditor are coextensive with the rights of a beneficiary. According to the majority, the court in *Zeoli* first analyzed the right of the creditor to reach the assets held in trust for the beneficiaries, and, only after determining that the creditor did not have access to the trust funds did the court consider whether the funds were available to the beneficiaries. The majority thus asserts that, if the rights of creditors are coextensive with those of beneficiaries, there would have been no need for this court to conduct a separate analysis of the beneficiaries' rights to the assets of the trust. I disagree with the majority's characterization of *Zeoli*.

In *Zeoli*, the court did not undertake a two part analysis of the issue, as the majority suggests. In analyzing the right of the creditor to reach the assets held in trust for the beneficiaries, the court concluded that "[a] trust [that] creates a fund for the benefit of another, secures it against the beneficiary's own improvidence, and places it beyond the reach of his creditors is a spend-thrift trust. . . . Section 52-321 of the General Statutes provides that trust fund income is not subject to the claims of creditors of the beneficiary if the trustee is granted the power to accumulate or [to] withhold trust income [from the beneficiary] or if the income has been expressly given for the support of the beneficiary or his family. . . . Since . . . [the] will specifically provides the trustee with the power to accumulate and [to] withhold trust income, its language creates a spend-thrift trust under § 52-321." (Citations omitted.) *Zeoli* v. *Commissioner of Social Services*, supra, 179 Conn. 88. Our reference in *Zeoli* to the trustee's "power to

accumulate and [to] withhold trust income"; id.; makes sense only if understood to mean the trustee's power to accumulate and to withhold such income from a beneficiary of the trust. Moreover, the court explicitly recognized that a spendthrift trust secures the assets against the beneficiary's own improvidence. Id. The court in *Zeoli* thus equated a creditor's rights to reach the assets of a trust with those of the trust's beneficiaries. See id.

Furthermore, the "second" portion of the *Zeoli* opinion, which focused on the rights of the beneficiaries, addressed specific arguments raised by the commissioner, some of which concerned the intent of the testator to make the assets of the trust available to the beneficiaries. Id., 88–91. In its analysis, the court explained why each argument was unpersuasive. See id., 90–92. The court's response to the commissioner's arguments thus supported, but was not essential to, its prior conclusion that the rights of creditors to the assets of a trust were the same as the rights of beneficiaries.

It also should be recognized that, although the Probate Court labeled the trust created for the benefit of the plaintiff as a "special needs" trust, the court did not mean "special needs" as defined by the majority or the federal statute to which it cites.[12] Rather, the Probate Court actually meant to label the trust as a "supplemental needs" trust. In its report, the committee addressed the contrasting claims of the parties, describing the arguments as a dispute between whether the trust qualified as one for the plaintiff's "general support" or one for her " 'special needs.' " Under a "special needs" trust, as defined by federal statute[13] and by the majority, however, the state *will* receive the funds remaining in the trust upon the beneficiary's death. Such a provision

[12] The majority cites to 42 U.S.C. § 1396p (d) (4) (A).

[13] See 42 U.S.C. § 1396p (d) (4) (A) (2000).

does not exist in the trust in the present case. If the Probate Court truly had intended to classify the trust, and the trustees' claims concerning the trust, as a "special needs" trust as defined by the majority, then no controversy would have arisen between the parties because a "special needs" trust, under the definition advanced by the majority, gives the state the right to access the trust funds. Thus, the Probate Court could not have intended to construe the trust in such a way, and clearly intended to equate a "special needs" trust with a "supplemental needs" trust.

Moreover, the trustees' petition to the Probate Court likewise uses the term "special needs" trust, but obviously could not have intended such a classification in the manner defined by the majority. Instead, the trustees made clear that they were seeking "a ruling classifying [the] trust as a 'special needs' trust, *from which it is neither appropriate nor required to reimburse* [*the*] *state for benefits received by* [*the plaintiff*] . . . ." (Emphasis added.) In their petition, the trustees also highlighted the provisions in the trust granting them discretion to disburse funds and requiring them to consider other sources of support to the plaintiff and " 'the advisability of supplementing such income or assets.' " On the basis of these provisions, the trustees described the intention of the testator that the trust "be used, *in the discretion of the trustees, to supplement, not supplant, such benefits, and the trustees believe that their administration of* [*the*] *trust is in accordance with that intention.*" (Emphasis added.) Thus, it is beyond serious debate that the trustees in fact intended to ask for a construction of the trust as a "supplemental needs" trust that is unreachable by the state.

In light of the fact that the Probate Court determined, and the trustees in fact claimed, that the will established a trust for the plaintiff's supplemental needs, it is further apparent that the Probate Court necessarily determined

that the trust assets were not available to the plaintiff. As the majority itself recognizes, and our precedent makes clear, "supplemental needs trusts, in which a trustee retains unfettered discretion to withhold the income, *are not considered available to the beneficiary. Connecticut Bank & Trust Co.* v. *Hurlbutt,* 157 Conn. 315, 327, 254 A.2d 460 (1968) (spendthrift trust not open to alienation or assignment by anyone until paid over to beneficiary); *Bridgeport-City Trust Co.* v. *Beach,* [119 Conn. 131, 141, 174 A. 308 (1934)] (beneficiary may not alienate or assign interest of spendthrift trust)." (Emphasis added.) Part II of the majority opinion; see also *Zeoli* v. *Commissioner of Social Services,* supra, 179 Conn. 90, 92, 95 (concluding that trust was created for beneficiaries' supplementary support, that because "the assets held in the spendthrift trust were not intended for the [beneficiaries'] general support, they could not compel their distribution," and that beneficiaries could not "compel distribution or in any manner alienate the money in the account beyond that authorized to be distributed as supplementary support in the trustee's discretion").

Accordingly, in my view, the majority makes a distinction without a difference, as the Probate Court previously had necessarily determined the issue later decided by the hearing officer regarding the availability of the trust assets to the plaintiff.

## II

I next must determine whether the parties "actually litigated" this issue, whether the Probate Court and the hearing officer "determined [the issue] by a valid and final judgment," and whether "that determination [was] essential to the judgment." (Internal quotation marks omitted.) *DaCruz* v. *State Farm Fire & Casualty Co.,* supra, 268 Conn. 686, quoting *Cumberland Farms, Inc.* v. *Groton,* supra, 262 Conn. 58.

In their petition to the Probate Court for construction of the trust under the will, a proceeding in which the department was a party, the trustees requested that the court "construe the terms of [the] trust as they pertain to any rights the state of Connecticut . . . may have to claim reimbursement from the trust for benefits heretofore provided to the [plaintiff] by [the] state, and/or for any such benefits provided by the state to the [plaintiff] in the future." The report of the committee, which the Probate Court incorporated by specific reference in its order, sets forth the arguments of the parties as follows: "[T]he trustees maintain [that] the testator intended the assets of the trust be used to supplement whatever other income and assets are available to the [plaintiff]. [The department] disagrees and argues that the trust is one providing for the general support of the [plaintiff] and that the trust principal and income should be distributed to [the plaintiff]."

In its June 12, 2001 order, the Probate Court acknowledged that the trustees had asked it "to construe the will . . . in the context of the trust's vulnerability to the claims of . . . the [department] that the trust assets were 'available' to the [plaintiff]." Upon consideration of the evidence, the Probate Court determined that "[t]he trust at issue [was] a 'special needs, discretionary trust,' not otherwise available to the state . . . ."

By comparison, at the administrative hearing, the department presented its claim that, "based upon existing case law and the way that the trust is written by [the testator] . . . the trust is a general support trust and . . . was intended to provide for the needs of [the plaintiff] and there is nothing in the trust to so indicate that it is to be used only as a supplemental needs [trust]." In its request for reconsideration of the hearing officer's July 17, 2001 decision, the department recognized that "[t]o determine whether the present trust is an available asset of [the plaintiff], the hearing officer

needed to determine whether the trust is a general support [trust] or a discretionary supplemental needs trust."[14]

At the administrative hearing, the plaintiff stated that "[t]he issues in [the] construction action [in the Probate Court] are identical to the issues [in] the administrative hearing . . . ." Moreover, the plaintiff asserted that application of the relevant case law "leaves no doubt as to the fact that this [trust] is intended to be a supplemental needs trust, not a general support trust."

After receiving evidence, the hearing officer found that "[t]he [department's] reason for discontinuing the [plaintiff's] benefits was [that] '[t]he value of [her] assets [was] more than the amount [the department] allow[s] [her] to have.' " The hearing officer also determined, contrary to the determination of the Probate Court, that "[t]he corpus and income of the trust are an available asset to the [plaintiff]." Furthermore, unlike the Probate Court, the hearing officer concluded that "[t]he trust is not exempt from consideration as an asset in determining the [plaintiff's] ongoing eligibility for assistance from the [department]," and that "the [department's] action to discontinue the [plaintiff's] benefits . . . was correct."

From an examination of the arguments advanced by the parties in both proceedings, there is no question that they actually litigated the issue regarding the nature of the plaintiff's trust assets before the Probate Court and the hearing officer. In both proceedings, the par-

---

[14] As the majority acknowledges, the office of the attorney general, acting on behalf of the department, in a letter to the Probate Court asking the court not to construe the terms of the trust, conceded that the department "already [had] held an administrative hearing on this *exact issue* . . . ." (Emphasis added.)

ties[15] asked the Probate Court and the hearing officer to determine whether the trust assets were "available" to the plaintiff.

Moreover, as is evident from the Probate Court's order and the hearing officer's decision, the key fact necessarily determined by the Probate Court, and relitigated subsequently in the administrative appeal, was the determination of the character of the plaintiff's trust funds as either available assets or unavailable assets. Although the majority posits that it "cannot conclude that the Probate Court's characterization of the trust as a 'special needs, discretionary trust' necessarily determined the issue in the present case, namely, whether the trust was an asset available to the plaintiff," the explicit language of the Probate Court's clear statement of the issue, its declaration in its order that the trust assets were "not otherwise available to the state of Connecticut or other creditors of the [plaintiff] for her care and support," the necessary implication from

---

[15] I am mindful of the fact that, "[h]istorically, the doctrine of collateral estoppel, or issue preclusion, required mutuality of the parties. . . . Under the mutuality rule, [p]arties who were not actually adverse to one another in a prior proceeding could not assert collateral estoppel against one another in a subsequent action." (Citation omitted; internal quotation marks omitted.) *Torres* v. *Waterbury*, 249 Conn. 110, 135, 733 A.2d 817 (1999), quoting *Labbe* v. *Pension Commission*, 239 Conn. 168, 186, 682 A.2d 490 (1996). This court has recognized, however, that "[t]he mutuality requirement has . . . been widely abandoned as an ironclad rule. . . . [T]he [mutuality] rule . . . no longer operate[s] automatically to bar use of [the doctrine of] collateral estoppel . . . but . . . circumstances may exist in which lack of mutuality would render application of [the doctrine] unfair." (Citations omitted; internal quotation marks omitted.) *Torres* v. *Waterbury*, supra, 135–36, quoting *Labbe* v. *Pension Commission*, supra, 186. Thus, "[a] party precluded from relitigating an issue with an opposing party . . . is also precluded from doing so with another person unless the fact that he lacked full and fair opportunity to litigate the issue in the first action or other circumstances justify affording him an opportunity to relitigate the issue." (Internal quotation marks omitted.) *Torres* v. *Waterbury*, supra, 136, quoting 1 Restatement (Second), Judgments § 29, p. 291 (1982). This maxim is not implicated in the present case because the plaintiff and the department were adverse parties in both proceedings.

this determination that the plaintiff could not access the trust funds, and the fact that the Probate Court equated a "special needs" trust with a "supplementary needs" trust, the assets of which are unreachable by the plaintiff, all serve to refute this supposition.[16] Con-

---

[16] The majority contends that it cannot "premis[e] the application of the doctrine of collateral estoppel on a mere inference," and that "the addition of an inferential step is sufficient to negate the required identity of the issues." An abstract or unnecessary inference does not flow from the Probate Court's determination, however; instead, a determination of the plaintiff's lack of access to the trust assets is an *inescapable implication* of that determination.

Moreover, the cases on which the majority relies in support of its conclusion, namely, *Nancy G.* v. *Dept. of Children & Families*, 248 Conn. 672, 682, 733 A.2d 136 (1999), and *Crochiere* v. *Board of Education*, 227 Conn. 333, 344–46, 630 A.2d 1027 (1993), do not support its proposition. In both cases, this court determined that the doctrine of collateral estoppel did not preclude the subsequent litigation of an issue because the record did not indicate the specific basis on which the determination of the issue had been made and more than one basis for the determination could have existed. See *Nancy G.* v. *Dept. of Children & Families*, supra, 681–82; *Crochiere* v. *Board of Education*, supra, 344–46. Thus, in *Nancy G.*, we determined that, because the Probate Court's decree was "susceptible of two conclusions"; *Nancy G.* v. *Dept. of Children & Families*, supra, 681; the doctrine of collateral estoppel did not preclude litigation of the relevant issue in the subsequent proceeding. Id., 682. Likewise, in *Crochiere*, the doctrine of collateral estoppel did not apply because "[t]he record before this court regarding the 1987 termination hearing reveal[ed] *only that the plaintiff was dismissed.* The dismissal, therefore, may have been for inefficiency or incompetence, insubordination against reasonable rules or disability as shown by competent medical evidence.

\* \* \*

"In the absence of a record to support the defendant's assertions that the hearing officer at the termination proceeding concluded that the plaintiff had inappropriately touched a student and that, as a consequence, he was terminated as a teacher, the [workers' compensation] commissioner was not precluded from inquiring into the allegations of willful misconduct or from deciding that very issue in the context of the workers' compensation hearing." (Citation omitted; emphasis added.) *Crochiere* v. *Board of Education*, supra, 227 Conn. 344–46. In the present case, the Probate Court was clear in that it was called upon to determine whether the trust assets were available to the plaintiff, and it determined that those assets were not available to either the state or the plaintiff's creditors and, as a necessary consequence, were not available to the plaintiff as well. Thus, *Nancy G.* and *Crochiere* are inapposite.

trary to the majority's assertion, therefore, the Probate Court's determination in this regard was "essential to the judgment"; (internal quotation marks omitted) *DaCruz* v. *State Farm Fire & Casualty Co.*, supra, 268 Conn. 686; because the availability of the trust assets constituted the decisive issue presented to and determined by the Probate Court.

Accordingly, because the parties actually litigated, and both the Probate Court and the hearing officer necessarily determined, the issue of the availability of the trust assets to the plaintiff, I believe that the doctrine of collateral estoppel precluded the hearing officer's subsequent construction of the trust[17] and that the Probate Court's order should have been conclusive with respect to this matter. I therefore would reverse the judgment of the trial court to the contrary.

Accordingly, I respectfully dissent.

---

[17] This court previously has not determined whether an order of the Probate Court can collaterally estop a subsequent determination by an administrative agency on the same issue. In light of the goals of finality, economy and consistency of judgments embodied by the doctrine of collateral estoppel; e.g., *DaCruz* v. *State Farm Fire & Casualty Co.*, supra, 268 Conn. 686; and the comparable quantum of proof necessary to establish the availability, or unavailability, of the trust assets in both the Probate Court and the administrative proceedings; see footnote 10 of this opinion and accompanying text; it appears that the doctrine of collateral estoppel properly may apply in the present case. Cf., e.g., *Brower* v. *Killens*, 122 N.C. App. 685, 690, 472 S.E.2d 33 (1996) (when quantum of proof is "virtually identical" with respect to court's determination in criminal case and administrative agency's determination in license revocation proceeding, party cannot relitigate issue previously decided by court); *Thompson* v. *Dept. of Licensing*, 138 Wash. 2d 783, 797, 982 P.2d 601 (1999) (when same rules of evidence apply and issue has been fully litigated, evidentiary ruling in criminal case can have preclusive effect in subsequent administrative proceeding). Moreover, the failure to preclude relitigation of the same issue previously determined by a court in a later administrative proceeding undoubtedly would have the effect of undermining the integrity of judicial determinations. See, e.g., *Zapata* v. *Dept. of Motor Vehicles*, 2 Cal. App. 4th 108, 115, 2 Cal. Rptr. 2d 855 (1991) ("[w]hen . . . it is the prior judicial decision that is being ignored in the subsequent administrative hearing, the impact on the integrity of [the] judicial system is . . . direct and magnified" [internal quotation marks omitted]).